**Robert CANTRELL and Georgia Cantrell (89–3221); Charles E. Marple and Angelina Marple (89–3231), Plaintiffs–Appellees,**

v.

**GAF CORPORATION, et al., Defendants,**

**Carey Canada, Inc. and Celotex Corporation, Defendants–Appellants.**

Nos. 89–3221, 89–3231.

United States Court of Appeals, Sixth Circuit.

Argued June 10, 1993.

Decided July 26, 1993.

Robert L. Jennings, Jr. (argued and briefed), Henderson & Goldberg, Pittsburgh, PA, Catherine Adams, Scott E. Knox, Adams, Thienhaus & Knox; and M. Catherine Lacinak, Kircher, Robinson, Cook, Newman & Welch, Cincinnati, OH, for plaintiffs-appellees.

Thomas M. Green, Green & Green, Dayton, OH; Jeffrey W. Warren, Lynn Van Ramey, Wendy V.E. England, Bush, Ross, Gardner, Warren & Rudy, Tampa, FL; and Michael D. Eagen (argued and briefed), Cincinnati, OH, for defendants-appellants.

James S. Monahan (briefed) and Sylvia L. Gillis, Bricker & Eckler, Columbus, OH, for amicus curiae.

Before: RYAN, Circuit Judge; WELLFORD, Senior Circuit Judge; and JOINER, Senior District Judge.*

* Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation.

JOINER, Senior District Judge.

Defendants Celotex Corporation and Carey Canada, Inc., appeal[1] following adverse jury verdicts in the consolidated trials of the claims of two former Celotex employees for injuries resulting from their exposure to asbestos during the course of their employment. The jury found Celotex liable for intentional tort and found Carey Canada both negligent and strictly liable. The jury awarded $750,000 to each worker in compensatory damages, and $250,000 to each spouse for loss of consortium. The jury also awarded each worker $500,000 in punitive damages, solely against Celotex.

Defendants challenge (1) the consolidation of these cases for trial; (2) the admission of evidence of the risk of cancer resulting from asbestos exposure; (3) the admission of evidence of two cases of laryngeal cancer at the plant at which plaintiffs had worked; (4) the denial of Celotex's motion for directed verdict on intentional tort liability; (5) the denial of Celotex's motion for directed verdict on punitive damages; and (6) the award of prejudgment interest without holding an evidentiary hearing.[2]

We affirm the judgments in plaintiffs' favor.

## I.

Plaintiffs Robert Cantrell and Charles Marple are former employees of the Celotex Lockland facility, where they were involved in the production of building materials, an ingredient of which was asbestos fiber. Cantrell was employed from April 1952 to December 1987. He was 58 at the time of trial and suffered from asbestosis. Cantrell had also had laryngeal cancer, resulting in the complete removal of his voice box eleven months before trial. Marple was employed from February 1967 to August 1983. He was 46 at the time of trial and also suffered from asbestosis.

Neither Cantrell nor Marple had cancer at the time of trial. However, Cantrell claimed damages for his laryngeal cancer and presented evidence of a greater than 30 percent likelihood that his laryngeal cancer would recur. Marple testified that he was told by one of his treating physicians that his throat would probably become cancerous, and that he had been instructed to have periodic biopsies to monitor the condition of his larynx.

Additional facts are set forth where pertinent.

## II.

■ The parties report that at the final pretrial conference the trial court ordered the consolidation of two of the ten trial-ready cases in which asbestos is claimed to be the cause of various injuries. The court directed plaintiffs' counsel to choose one case and defendants' counsel another. Plaintiffs selected the Cantrell case, and defendants selected the Marple case. Defendants now contend that the trial court erred by consolidating these cases for trial before one jury because plaintiffs suffered from dissimilar diseases. They claim that as the evidence developed, it became apparent that plaintiffs would unfairly profit from the consolidation by creating the impression that Marple's condition would some day advance to laryngeal cancer like that suffered by Cantrell. Defendants objected to consolidation in their post-trial motions, but concede that they did not make any objection on the record prior to trial.

■ Consolidation is governed by Federal Rule of Civil Procedure 42(a):

When actions involving a common question of law or fact are pending before the court,

---

1. These cases were originally argued in 1990, but the appeals were subsequently stayed because defendants filed a Chapter 11 bankruptcy petition. The bankruptcy court recently ordered that the stay be lifted to allow the appeals to proceed to conclusion, including the issuance of appellate decisions and necessary mandates. Collection efforts remain stayed, however. We invited the parties to supplement their briefs and to reargue the cases.

2. Defendants acknowledge that their challenges to the trial court's allocation of the burden of proof on the cause of plaintiffs' injuries and to the imposition of strict liability are foreclosed by recent decisions of the Ohio Supreme Court. *Pang v. Minch*, 53 Ohio St.3d 186, 559 N.E.2d 1313 (1990); *Crislip v. TCH Liquidating Co.*, 52 Ohio St.3d 251, 556 N.E.2d 1177 (1990).

it may order a joint hearing or trial of any or all of the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Whether cases involving the same factual and legal questions should be consolidated for trial is a matter within the discretion of the trial court, and the court's decision is reviewed for abuse of discretion. *Stemler v. Burke*, 344 F.2d 393, 396 (6th Cir.1965). A court may issue an order of consolidation on its own motion, and despite the protestations of the parties. *In re Air Crash Disaster at Detroit Metro. Airport*, 737 F.Supp. 391, 394 (E.D.Mich.1989).

Consolidation of asbestos cases for trial has been common. *E.g.*, *Malcolm v. National Gypsum Co.*, 995 F.2d 346 (2d Cir.1993); *Hendrix v. Raybestos–Manhattan, Inc.*, 776 F.2d 1492 (11th Cir.1985); *Cain v. Armstrong World Indus.*, 785 F.Supp. 1448 (S.D.Ala.1992); *In re Joint Eastern and Southern Asbestos Litigation*, 125 F.R.D. 60 (E.D.N.Y.1989). In *Hendrix*, the court counseled that a trial court making a decision to consolidate must consider:

> [W]hether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*Hendrix*, 776 F.2d at 1495 (quoting *Arnold v. Eastern Air Lines, Inc.*, 681 F.2d 186, 193 (4th Cir.1982), *cert. denied*, 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983)). *Accord In re Joint Eastern and Southern Dist. Asbestos Litigation*, 125 F.R.D. at 64–65.

■ Thus, the decision to consolidate is one that must be made thoughtfully, with specific reference to the factors identified above. Care must be taken that consolidation does not result in unavoidable prejudice or unfair advantage. Conservation of judicial resources is a laudable goal. However, if the savings to the judicial system are slight, the risk of prejudice to a party must be viewed with even greater scrutiny. The potential for prejudice resulting from the consolidation of a cancer case with a non-cancer case is obvious. Evidence relevant only to the causation of one plaintiff's cancer may indicate to the jury that the other plaintiff will likely develop cancer in the future. Even where the plaintiffs share similar work histories and suffer from other similar conditions as they do in this case, the trial court must carefully assess the risk of prejudice to the defendant before consolidating cancer and non-cancer cases. We note that in these cases, the potential for prejudice was ameliorated by the fact that risk of cancer testimony was admissible in any event to demonstrate plaintiffs' fear of cancer, as discussed in Part III.

■ We are convinced that we should not reverse because of the consolidation of these cases despite some concern whether the district court made its consolidation decision based on the commonality of questions of law and fact as Rule 42(a) and precedent demand.[3] However, no error exists in the district court's consolidation of claims for trial in the absence of an objection to such consolidation or a motion for severance. *Crutcher v. Kentucky*, 961 F.2d 1576, 1992 WL 98020, at *4 (6th Cir.1992) (per curiam) (citing *Jackson v. Shell Oil Co.*, 401 F.2d 639, 644 (6th Cir. 1968)); *Ikerd v. Lapworth*, 435 F.2d 197, 204 (7th Cir.1970). For whatever strategic reasons, defendants selected the Marple case for consolidation. Once the Marple case was matched with the Cantrell case, the potential for prejudice resulting from a possible spillover effect of evidence relevant to the Cantrell case was obvious. Yet defendants made no objection to the consolidation, and proceeded to trial. Perhaps defendants hoped that the facts of the Marple case would somehow balance those of the Cantrell case, in-

---

**3.** The record suggests that the court simply might have delegated this critical decision to the attorneys for the parties, rather than carefully and thoroughly considering all of the factors relevant to a consolidation inquiry. In the absence of a more compelling record of failure on the part of the district judge to consider the Rule 42(a) factors, we will not assume that the court was derelict in its duty.

volving, as it does, a plaintiff who had suffered cancer and the complete removal of his larynx, and who could testify only through one word answers and nods of his head.

The reasons for defendants' designation of the Marple case for consolidation with the Cantrell case need not be investigated. It is enough that they made the designation and did not object prior to trial. Under these circumstances, we will not reverse.

### III.

■ Neither plaintiff had cancer at the time of trial, but sought damages for their fear that they would develop cancer in the future. Defendants contend that the trial court erred in admitting evidence that plaintiffs had an increased risk of contracting cancer due to their asbestos exposure.

In *Lavelle v. Owens–Corning Fiberglas Corp.*, 30 Ohio Misc.2d 11, 30 OBR 223, 507 N.E.2d 476 (1987), the court held that while an asbestos plaintiff may not recover damages for an increased risk of cancer in the future, he may nonetheless recover damages for his present fear that he will contract cancer due to his asbestos exposure. The court thus denied the defendant's motion to exclude evidence relating to the increased risk of cancer.

A real distinction can be drawn between the possibility of recovery for increased risk of cancer and that for increased fear of cancer ("cancerphobia").... Cancerphobia is a claimed present injury consisting of mental anxiety and distress over contracting cancer in the future, as opposed to risk of cancer, which is a potential physical predisposition of developing cancer in the future.

....

Increased fear of cancer, to be compensable, means that an asbestosis-afflicted plaintiff is aware that he in fact possesses an increased statistical likelihood of developing cancer, and that from this knowledge springs a reasonable apprehension which manifests itself in mental distress. Reasonable in this context is not equivalent to probability or certainty, but is for a factfinder to determine.

507 N.E.2d at 480–81 (citations and footnote omitted).

In this case, the trial court specifically instructed the jury that no damages could be awarded for an increased risk of cancer, but stated that the jury

may award, as an element of compensatory or actual damages, damages proved for emotional distress suffered as a result of demonstrated fear of developing an asbestos-related cancer.

....

The question of whether plaintiffs' apprehensions of developing cancer are reasonable is for you the jury to determine. The probability of plaintiffs developing cancer is but one factor to be considered in making this determination.

Defendants make no claim that these instructions are incorrect.

Evidence of an increased risk of cancer is relevant to whether a plaintiff's fear of cancer is reasonable, as required by *Lavelle*, and reflected in the jury instructions. This evidence, in addition to the evidence that both Cantrell and Marple had an actual fear or concern about the risk of cancer were the necessary predicates for the mental anguish damages they sought. The district court's admission of the risk of cancer evidence was therefore proper.[4]

### IV.

■ Dr. Michael Kelly examined both Cantrell and Marple as part of a screening process set up by the union representing workers at the Lockland facility. Dr. Kelly testified at his deposition regarding the association between asbestos exposure and laryngeal cancer based upon epidemiologic evidence reported in medical literature. When asked whether there was anything other than medical literature that provided a basis for

---

4. We reject defendants' argument that the testimony of Drs. Dohn, Hochron and Kelly was inadmissible because plaintiffs did not show that these doctors personally communicated the risk of cancer to plaintiffs. *Lavelle* does not require that the plaintiffs be personally informed of the increased risk of cancer by each expert who might be called to testify at trial.

his opinion, Dr. Kelly stated that he had diagnosed three individuals as having laryngeal cancer from the 150 workers he personally examined from the Lockland facility.

> That by itself doesn't prove that something there is causing—something like asbestos is causing the problem, but that kind of prevalence or incidence is very high, far in excess of—hundreds of times what one might have expected. In fact, one wouldn't expect to find laryngeal cancer in 150 people. Its incidence is far less than that.

According to Dr. Kelly, the incidence of laryngeal cancer in the general population is about four per 100,000 individuals per year.

> Again, this is a highly unusual—you can't exactly go from four cases per 100,-000 to three cases among 150 people. One would want to look at more prevalent studies but, still, just an eyeballing of those kinds of numbers, four per 100,000 and three in 150 people, those are stark, striking contradictions.

Dr. Kelly further testified that "as with Mr. Cantrell," the cause of the laryngeal cancer suffered by the two other Lockland workers was a combination of both cigarettes and asbestos. Dr. Kelly explained that cigarettes and asbestos work in a synergistic fashion to make the likelihood of cancer much greater.

Defendants objected to the admission of Dr. Kelly's deposition testimony, asserting that three cases of laryngeal cancer, all in smokers who had been exposed to asbestos, was not probative of the association between asbestos and cancer. According to defendants, the incidence of laryngeal cancer must be measured against the general population which, while including smokers, is not comprised exclusively of smokers. Thus, they claimed that Dr. Kelly's testimony did not constitute proper epidemiologic evidence. Defendants further asserted that the evidence was more prejudicial than probative under Fed.R.Evid. 403.

The trial court overruled defendants' motion in limine, holding that the testimony of Dr. Kelly would be admitted, and that the jury could the consider weight to be given to

that testimony in light of the opinions of defendants' expert, Dr. Jack Gluckman. Dr. Gluckman testified that the medical literature on asbestos exposure contained no evidence that asbestos had been proven to be either a causative agent or potentiator of cancer. Dr. Gluckman acknowledged that the "general population" which experiences a laryngeal cancer incidence of five to ten cases per 100,000 people per year would include smokers and drinkers. However, he stated that he would not be concerned by confirmation of three laryngeal cancer cases out of a total of 1500 workers in a particular factory, where the affected workers had smoked and consumed alcohol to a significant extent. In Dr. Gluckman's opinion, the sole cause of Mr. Cantrell's cancer was smoking.

The admissibility of expert testimony is governed by Fed.R.Evid. 702:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The basis of opinion testimony by experts is governed by Fed.R.Evid. 703:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Defendants' challenge to Dr. Kelly's testimony is addressed in the Supreme Court's recent decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* — U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). There the Court held that the requirement previously stated in *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923), that expert opinion must be based on techniques or methodology generally accepted in the relevant scientific community was superseded by the Federal Rules of Evidence, in particular Rule 702.[5]

---

5. The *Frye* test was questioned in this court several years ago. *United States v. Kozminski,* 821

Pursuant to that rule, the trial judge must determine whether an expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine a fact in issue. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.,* — U.S. ——, 113 S.Ct. at 2786. In assessing the reliability of particular evidence, the court *may,* but is not required to, consider the degree of its acceptance in the scientific community. The inquiry envisioned by Rule 702 is a "flexible one," whose "overarching subject is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Id.*

Nothing in Rules 702 and 703 or in *Daubert* prohibits an expert witness from testifying to confirmatory data, gained through his own clinical experience, on the origin of a disease or the consequences of exposure to certain conditions. Dr. Kelly identified recognized sources for his opinion on the association between asbestos exposure and laryngeal cancer, and defendants do not challenge the admissibility of his opinion testimony to the extent that it is premised on these sources. Defendants' chief objection to Dr. Kelly's mention of the other laryngeal cancer cases was addressed by Dr. Kelly himself, when he acknowledged that the incidence of laryngeal cancer in the plant does not alone prove that asbestos was the culprit. Dr. Kelly was subject to cross-examination, and his views were countered by the testimony of defendants' expert. Under these circumstances, we find no error in the admission of Dr. Kelly's testimony. *See Payton v. Abbott Labs,* 780 F.2d 147, 156 (1st Cir.1985) (drug liability case rejecting a Rule 703 challenge to expert testimony based in part on the physician witnesses' clinical experience with patients who had been exposed to the drug); *Scholz Homes, Inc. v. Wallace,* 590 F.2d 860, 863 (10th Cir.1979) (finding no abuse of discretion in admission of expert testimony

where the witness disclosed any inadequacies in the information he was relying on, and was subjected to thorough cross-examination).

 Our concern with Dr. Kelly's testimony is the potential for prejudice resulting from his identification of the Lockland facility as the particular plant at which the three workers contracted laryngeal cancer. However, defendants did not object to Dr. Kelly's testimony on this specific basis. A trial court has broad discretion in admitting and excluding expert testimony, and this court will sustain the trial court's action unless it is manifestly erroneous. *Porter v. Lima Memorial Hosp.,* 995 F.2d 629 (6th Cir.1993) (citing *Mayhew v. Bell S.S. Co.,* 917 F.2d 961, 962 (6th Cir.1990)). We will not disturb the trial court's exercise of discretion in these cases. Even if Dr. Kelly's reference to the Lockland plant was prejudicial, in light of the complete record in this case, it was not so prejudicial as to significantly impair defendants' right to a fair trial. *Porter,* 995 F.2d at 637.

In sum, the admission of Dr. Kelly's testimony provides no basis to reverse the judgments in this case.

## V.

 Celotex claims that the trial court erred in denying its motion for a directed verdict on plaintiffs' intentional tort claim. Celotex expressly disclaims any reliance on a weight of the evidence argument, asserting instead that plaintiffs' claim was insufficient as a matter of law because it was premised on Celotex's failure to institute more rigorous safety controls and failure to warn adequately its employees of an asbestos health hazard. We apply Ohio's standard for a directed verdict:

Ohio courts require that a court presented with a motion for a directed verdict construe the evidence and all permissible inferences therefrom most strongly in favor of the party against whom the motion is made and consider neither the weight of the evidence nor the credibility of the wit-

F.2d 1186, 1212–19 (6th Cir.1987) (Guy, J., dissenting), *aff'd,* 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988).

nesses in disposing of the motion. Such a motion will be granted only if, after considering the evidence in this light, there can be but one reasonable conclusion as to the proper verdict.

*Construction Interior Sys. Inc. v. Marriott Family Restaurants, Inc.*, 984 F.2d 749, 753 (6th Cir.1993) (quoting *Potti v. Duramed Pharmaceuticals*, 938 F.2d 641, 645 (6th Cir. 1991)).

Plaintiffs' evidence on their intentional tort claim need only be briefly recounted. In 1962, Celotex retained Dr. Thomas Mancuso, the former head of the Ohio Division of Industrial Hygiene, to assist the company in developing policies and procedures to protect employees and users of its products. His consultancy lasted approximately one year. Dr. Mancuso testified that he was given death certificates of four Lockland workers listing asbestosis as the cause of death. Dr. Mancuso further testified that in some areas of the plant, "there was enough asbestos on the floor you could shovel it," that a respirator, if used, would become clogged within an hour because the dust was so thick, and that there was no evidence of warning labels or control measures. Dr. Mancuso warned Celotex of the serious and potentially fatal effects of asbestos exposure. Shortly after Dr. Mancuso submitted his report outlining sweeping measures to address the problem of asbestos exposure, Celotex terminated his consultancy and did not implement his suggestions for another ten years. Plaintiffs also presented evidence that Celotex conducted x-ray and pulmonary function study screenings on its employees, but did not explain to its employees, including plaintiffs, when these tests revealed disease, and at most told an affected worker that he had a possible medical problem and should consult his personal physician.

Based on this evidence, plaintiffs argued that their injuries were substantially certain to occur; that Celotex knew that asbestos exposure had caused cases of death and hundreds of cases of restrictive lung disease; that Celotex's policy was to withhold company knowledge concerning disease; and that Celotex did nothing in response to the information it obtained from Dr. Mancuso and the medical tests conducted on its employees "except keep quiet and hope this thing wouldn't blow up in their face at some point."

The intentional tort doctrine grants a remedy to injured employees for job-related accidents in avoidance of the workers' compensation bar. To establish the element of intent, the employee must demonstrate:

(1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.

*Fyffe v. Jeno's, Inc.*, 59 Ohio St.3d 115, 570 N.E.2d 1108, 1109 (1991), syllabus ¶ 1, modifying *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 522 N.E.2d 489, 491 (1988), syllabus ¶ 5.

To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk—something short of substantial certainty—is not intent.

*Fyffe*, 570 N.E.2d at 1110, syllabus ¶ 2, modifying *Van Fossen*, 522 N.E.2d at 491–92, syllabus ¶ 6. Celotex contends that the critical issue in this case is whether it intended to injure Cantrell and Marple, and, further, that intent to injure cannot be demonstrated sole-

ly by a failure to warn or take safety measures. Celotex relies on language in *Van Fossen*, 522 N.E.2d at 504:

> There are many acts within the business or manufacturing process which involve the existence of dangers, where management fails to take corrective action, institute safety measures, or properly warn the employees of the risks involved. Such conduct may be characterized as gross negligence or wantonness on the part of the employer. However, in view of the overall purposes of out Workers' Compensation Act, such conduct should not be classified as an "intentional tort" and therefore an exception . . . to the exclusivity of the Act.

Plaintiffs' intentional tort claim was submitted to the jury under instructions which correctly stated the elements of the tort as set forth in the *Van Fossen* syllabus language. The instruction also stated:

> The failure to warn, in and of itself, is not sufficient to prove intent.[6] The existence of this knowledge or intent on the part of the defendant, however, may be inferred from all of the conduct and surrounding circumstances. The actor must know or believe that harm is a substantially certain consequence of his act before an intent to injure will be inferred.

Celotex requested that the trial court include the entire paragraph quoted above from *Van Fossen* in the charge, and the trial court declined to do so. Thereafter, no objection to this aspect of the jury instruction was made, and even now Celotex does not claim that the case was submitted to the jury on erroneous instructions.

■ Plaintiffs were not required to demonstrate that Celotex acted with deliberate intent to cause them harm. This case, like most intentional tort cases, was based on conduct alleged to have been taken by Celotex with knowledge that harm was a substantial certainty. *Harasyn v. Normandy Metals, Inc.*, 49 Ohio St.3d 173, 551 N.E.2d 962, 964–65 (1990). Contrary to Celotex's claim, plaintiffs' proof went beyond failure to warn and to take safety measures. Plaintiffs presented evidence that Celotex, with knowledge that injury and even death were substantially certain to result from asbestos exposure, continued to expose its employees to asbestos, and followed a policy of not explaining to its employees when medical screening revealed the existence of disease, advising them only to consult with their own physicians.

■ We note further that almost any dangerous conduct undertaken by an employer can be characterized as a failure to take affirmative protective action for its employees. The removal of a guard from machinery can be characterized as a failure to take corrective action or institute safety measures. Exposure to toxic chemicals can be characterized as a failure to warn about their effects and a failure to provide adequate safety gear. The characterization of an employer's action does not control its liability, however. The critical inquiry in an intentional tort case is the likelihood that injury will occur. Where the employer acts with knowledge that injury is a substantial certainty, the employer has gone beyond negligence, recklessness and wantonness and committed an intentional tort. *E.g., Tulloh v. Goodyear Atomic Corp.*, 62 Ohio St.3d 541, 584 N.E.2d 729, 730–33 (1992) (reversing dismissal of complaint alleging that employer intentionally exposed plaintiff to radioactive materials, knowing that injury was substantially certain to occur, while concealing this information from plaintiff and failing to warn and establish safety standards); *Fyffe*, 570 N.E.2d at 1113–14 (reversing summary judgment for employer where injury caused by employer's removal of guard and employer allegedly knew removal of guard created a substantial risk of harm to employees); *Ailiff v. Mar–Bal, Inc.*, 62 Ohio App.3d 232, 575 N.E.2d 228 (1990) (reversing directed verdict for employer on evidence that employer instructed employees to use toxic chemical in unsafe manner without adequate protection, with knowledge of toxic effects of exposure).

The jury instructions were proper, and there is no claim to the contrary. Plaintiffs' evidence relevant to intentional tort liability was sufficient to support the verdicts and,

---

**6.** This language originated in dicta in *Pratt v. National Distillers & Chem. Corp.*, 853 F.2d 1329, 1338 (6th Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989).

likewise, there is no claim to the contrary. We are presented with no basis on which to disturb the jury's verdict.

## VI.

■ Celotex challenges the denial of its motion for a directed verdict on the issue of punitive damages. The parties agree that "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm" suffices as a predicate for punitive damages under Ohio law. *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174, 1176 (1987). The trial court properly instructed the jury that punitive damages could be awarded only on a finding of Celotex's flagrant indifference to the probability that its conduct would expose plaintiffs to a great probability of substantial harm.

■ Celotex asserts that plaintiffs did not present sufficient evidence that Celotex had knowledge of or acted in disregard of a great probability of substantial harm to plaintiffs. This argument presents a similar question to that posed by Celotex's challenge to its intentional tort liability. Based upon the evidence reviewed briefly in Part V, we conclude that this issue was properly submitted to the jury and that the trial court properly denied the motion for directed verdict.

■ Celotex also contends that where the cumulative effect of damages awarded in multiple lawsuits is to cause a defendant to file a Chapter 11 bankruptcy petition, as defendants have in these cases, the deterrence and retribution goals of punitive damages can be served no longer. Celotex asserts that this court should reverse the punitive damages awards to preserve available

funds for compensatory damages for other asbestos claimants.

This court rejected the so-called overkill argument in both *Cathey v. Johns–Manville Sales Corp.*, 776 F.2d 1565, 1569–70 (6th Cir.1985), *cert. denied*, 478 U.S. 1021, 106 S.Ct. 3335, 92 L.Ed.2d 740 (1986) (applying Tennessee law); and *Moran v. Johns–Manville Sales Corp.*, 691 F.2d 811, 816–17 (6th Cir.1982) (applying Ohio law). In both cases we expressed our view that relief from multiple punitive damage awards should not be sought from a federal court sitting in a diversity action but, rather, from the legislature under whose law the action is decided.[7]

Nor does Celotex's present bankruptcy status enhance its challenge in this court to the punitive damage awards. The bankruptcy court is particularly well situated to address Celotex's stated concern that affirmance of these awards will deplete the funds available for asbestos victims who seek only compensatory damages. The bankruptcy court will have before it the claims of all asbestos creditors, and will be able to prioritize those claims. The record before us provides no basis on which to upset damages which are supported by the evidence and which were awarded in conformance with controlling law.[8]

## VII.

■ Ohio allows recovery of prejudgment interest in civil cases as follows:

> Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party

---

7. Celotex claims that Ohio law prohibits multiple punitive damage awards based upon the same course of events, citing *Digital & Analog Design Corp. v. North Supply Co.*, 44 Ohio St.3d 36, 540 N.E.2d 1358 (1989). However, *Digital* held only that a single plaintiff could not receive multiple punitive damage awards arising out of a single course of events, upon which the plaintiff based several different causes of action. That holding does not prohibit the outcome here, by which

each plaintiff received only one punitive damage award.

8. Celotex makes no cognizable challenge to the punitive damage award based on federal due process grounds, nor would any such challenge be valid on the record before us. *TXO Prod. Corp. v. Alliance Resources Corp.*, —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

to the action, the court determines *at a hearing* held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case.

Ohio Rev.Code Ann. § 1343.03 (Anderson 1979; Supp.1993) (emphasis added). Defendants contend that the trial court erred in awarding prejudgment interest without first holding an evidentiary hearing. We disagree.

Plaintiffs moved for awards of prejudgment interest following the return of the verdicts in their favor, stating:

> The pre-judgment interest statute provides for a hearing to be held subsequent to the verdict, but in these cases plaintiffs waive any request for a formal hearing, since this motion can be resolved on the basis of the material facts contained herein, so long as they are unopposed by counsel for defendants.

When defendants filed no response, the trial court granted the motion, stating that "[e]xamination of the papers before the Court does not disclose that any of the facts asserted in plaintiffs' motion of [sic] prejudgment interest are disputed. Thus, the Court will decide this motion on the papers before it." [9]

The scope of the hearing requirement of section 1343.03 has been discussed by both state and federal courts. In *Whittington v. New Jersey Zinc Co.*, 775 F.2d 698, 703 (6th Cir.1985), this court noted that defendant had not advanced a convincing reason why the statute should be interpreted other than as compelling a hearing "upon the filing of a proper motion," and remanded the case for a hearing. Significantly, the plaintiffs had requested a hearing in their motion for prejudgment interest. In *Fischer v. Dairy Mart Convenience Stores, Inc.*, 77 Ohio App.3d 543, 602 N.E.2d 1204, 1214–15 (1991), the Ohio Court of Appeals held that section 1343.03 does not require an oral hearing on a motion for prejudgment interest, and that a non-oral hearing on the motion papers is sufficient to meet the hearing requirement of the statute.[10]

The trial court's award of prejudgment interest need not be vacated in this case. Plaintiffs expressly waived their right to a hearing in their motion for prejudgment interest, so long as the facts on which they relied were unopposed by the defendants. Defendants filed no response or opposition to plaintiffs' motion, although they filed their own post-trial motions for new trial, judgment notwithstanding the verdict and remittitur. Under these circumstances, any right that defendants might have had under section 1343.03 to an oral hearing on *plaintiffs'* motion was clearly and unequivocally waived.

We find no error in the district court's failure to hold an evidentiary hearing on plaintiffs' motion for prejudgment interest. The district court's decision to resolve plaintiffs' motion on the papers before it was permissible under *Whittington* and *Fischer*, and comported fully with the applicable federal rules.

**AFFIRMED.**

WELLFORD, Senior Circuit Judge, concurring.

Despite my serious concern about several prejudicial factors in this case, I am persuaded by my colleagues that we should affirm, although I do so reluctantly. One of the most persuasive circumstances in reaching

---

**9.** In awarding prejudgment interest, the trial court accurately recounted that defendants offered each plaintiff only $1500 pursuant to a settlement grid, which allocated a specific sum to a plaintiff depending only on the disease suffered and whether the plaintiff was a smoker or non-smoker. Other factors, such as the extent of the disease, the age of the plaintiff, the damages at issue, and the degree of involvement of the defendants, were not taken into account. The highest amount provided in the grid was $5000. The trial court's conclusion that defendants failed to make a good faith effort to settle was not erroneous.

**10.** The courts of Ohio have not been consistent in addressing the hearing requirement of section 1343.03. *See Novak v. Lee*, 74 Ohio App.3d 623, 600 N.E.2d 260, 265–66 (1991) (collecting cases and holding that an *evidentiary* hearing on a motion for prejudgment interest is required if the trial court determines that there may be grounds for granting the motion).

this decision was the failure of defendant to object to the joinder of these two causes of actions. Despite the failure of defendant to object, possibly for strategic reasons, the joinder of a case in which one plaintiff had experienced laryngeal cancer and recent removal of his voice box with another in which plaintiff had questionable causation symptoms only, comes close, in my view, to inherently prejudicial error. (Longstanding and excessive smoking habits could have caused identical injuries.) Consolidation of cases should only be permitted in this type of situation where plaintiffs allegedly suffer from the same condition and their medical prognosis is approximately similar. Otherwise, there is a great likelihood of a prejudicial spill-over effect from the more seriously ill or injured plaintiff to the other. The same jury verdict in these cases adds to this concern.[1] Consolidation which presents great risk to one side of prejudice is not justified by reason of conserving judicial time and resources.

Even more troubling was the challenged testimony of plaintiffs' expert, Dr. Kelly, about his experience in examining and observing other workers at the specific plant at which both plaintiffs had worked. Dr. Kelly was permitted, erroneously in my view, to testify about the "highly unusual" incidence (in his opinion) of laryngeal cancer among workers at the Lockland facility, which presented (to him) "stark, striking" evidence. This was akin to permitting a witness to give expert testimony against a railroad that a railroad crossing was dangerous and risky because he knew about two or three prior accidents at that location and this was "highly unusual." (The district court may have permitted Dr. Kelly to testify that he had personally observed episodes of laryngeal cancer to persons exposed to asbestos fiber, but *not* connected to *defendants* or the particular plant in issue.) Even if relevant, in my view, this admitted testimony should

have been excluded (with respect to identifying laryngeal cancer at the Lockland plant) as clearly and "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R.Evid. 403.[2] Again, defendants' failure to make a specific objection based on this potential prejudice persuades me to concur in the result reached despite my reservations.

One further concern in this case involving a bankrupt defendant is the matter of punitive damages. Were I writing on a clean slate in this court, I would adopt the language of then Chief Judge Charles Clark of the Fifth Circuit in his dissent in *Jackson v. Johns–Manville Sales Corp.*, 781 F.2d 394, 416, 417 (5th Cir.1986):

> Tens of thousands of similarly situated claimants are already seeking relief against the same defendants, and a legion of other potential plaintiffs stand in the wings, awaiting the predictable manifestations of their identical exposure. Other public and private plaintiffs seek recovery from the same defendants for costs incurred in removing asbestos materials from structures in every area of the country.
>
> . . . .
>
> The problems we face in this litigation are ones of national public policy. To respond to such policy is beyond the ability of this diversity-based court. Such policy cannot be subject to the whims of individual states because matters of national public policy have nationwide application. Since Congress has not provided a solution, the Supreme Court of the United States should have been asked to provide one.

I would hope the bankruptcy court dealing with bankrupt defendants in these cases will address the concerns that punitive damage awards of this magnitude, in addition to generous compensatory (and loss of consortium)

---

1. A good example of proper consolidation in the asbestosis context is *Hendrix v. Raybestos–Manhattan,* 776 F.2d 1492 (11th Cir.1985). All four plaintiffs suffered from substantially similar conditions arising out of like circumstances. Each plaintiff's award was different in *Hendrix* based on age, nature and progress of the illness, and other relevant factors.

2. This prejudicial testimony of Dr. Kelly was merely collateral in the formulation of his opinion; all the more reason it should have been excluded under Fed.R. of Evid. 403.

awards, to Marple and Cantrell may cause other plaintiffs later in time with similar claims against the defendants to be deprived of an opportunity to recover even compensatory damages. In addition, Marple will have the right to pursue yet another claim against Celotex if he were to develop cancer, and thus I would find his compensatory award to be excessive.[3]

Finally, I join in the decision based on prejudgment interest only because defendants failed to respond to plaintiffs' motions seeking such a recovery and, therefore, waived a defense to this claim.

With these express reservations, I concur in the judgment in this case.

---

**3.** Interest alone on the award to Marple and his wife would exceed his annual compensation at the time he ceased employment.